Please call the next case. May it please the court. Counsel. Richard Alexi on behalf of Ms. Magaddan. The briefing was fairly extensive, so I'm not going to regurgitate. I know that everyone on the bench this morning has read it. What I'm wondering, though, is whether or not anybody had the same halting concerns that I did when I reread the record over the weekend. The interesting thing about this case is very simply this. The lady has two injuries. You know that. The doctors at the company clinic restrict her activity. We know that. The company ignores that. So what does she do? Is she one of those phony, I'm going to watch Oprah and sit at home? No, she keeps working. Full duty. 120 plus orders an hour. May, June, July, August she has another occurrence. She's continuing to go to the doctor. They continue to say light duty. She has to do full duty. And then what happens when the doctors continue to increase the stridency of their opinions about light duty? They terminate her. They fire her. They pay her no benefits. They take away her lifeline. And what does the respondent do as a consequence of that function? They take videos of her going to her niece's shoe store so that she can afford herself the ability to use the phone. That video, which you are going to look at or have already, doesn't show her doing backflips, doesn't show her doing any job that's beyond what the doctor's restrictions are. And in fact, there is no evidence, no evidence to support the notion adopted by the arbitrator that she was gainfully employed. And in my brief, I cite a couple of cases about casual employment just to ensure that I don't totally ignore that, which is what the arbitrator should have done. You know, we have trial by ambush at the commission. Recently, I read Sycamore Row, John Gresham's latest opus, and they talk about trial by ambush in the old days, and now, of course, it's not as much fun because we know everything. At the commission, we don't have discovery, allegedly, and yet you have seen multiple cases come up before you where records, information, documents have been obtained in some form or other by subpoena without benefit of any sanction by the statute. It appears that there might be some contradictions between the record and the commission's findings regarding the rotator cuff. Yes. Could you hone in on those contradictions? Well, first of all, 2004. One of the 2004 elements was the fact that she had this complaint about her left shoulder. When we're talking about the right shoulder, they stipulated the right shoulder. They paid for the bills. And I know the old saw about payment of medical expenses and TTD or benefits is not an admission of liability. But that's not an ever-ending, eternal determination. I mean, at some point, common sense says if you're going to send a lady four times to an examiner, Dr. Nicholson, fine doctor, who, by the way, in his first report, you'll note that he said she had injuries to her left and her right shoulders. But I am constricted or restricted to examining only the right shoulder. Four times he sees her. Four times he confirms the anomalies. Three times he says, yeah, she needs a surgery. She needs a problem. And then when she finally goes to see Dr. Dohm because of the failure of recovery, they don't even send her to Nicholson for the fifth time. They just authorize the surgery and pay for it. That has consequences in this world. This isn't some naive adjuster who at the outset of receiving a form 45 decides, well, I better pay compensation right away because if I don't, after 14 days, I'm going to have penalties assessed against me. The commission's findings, the commission's, actually, the commission didn't do anything. James DeMuno and Mr. Gore and Mr. Bracero didn't do anything. How do I know that? Well, first of all, they just affirmed and adopted without any comment whatsoever. In a complicated case with 2,000 pages of medical, they have the temerity to suggest to this body and to these parties a life-altering event. We just affirmed it. And what about the arbitrator's conclusion? Well, Nicholson said on October 28, 2008, she's at MMI. What's the magic thing about MMI? What does MMI mean? I am so sick of hearing about maximum medical improvement. And we see it both from treaters as well as examiners, don't we? The doctor who does the surgery pats himself on the back and says, I did a great job. She's at MMI. But she needs pain management. She should see a physiatrist. She should continue to do therapy at home. Doesn't that, in fact, deflate, dilute the efficacy of that term, maximum medical improvement? And we saw by the records of Dr. Dohm that she finally was getting relief. She was finally getting progress in that right upper extremity. And Dr. Dohm's testimony. Please, how does the arbitrator strike the testimony of Dr. Dohm based upon this strange application of gear that says, oh, we didn't know what he was going to testify to. The only reason for the 19P8A, the only reason for taking the depositions of both Dr. Dohm and Dr. Nicholson, was because of the left shoulder pathology. And interestingly enough, when I asked on cross-examination, Dr. Nicholson, did they send you the stuff post-October 28th report, he said no. He didn't know about the MRI, which was consistent with findings that had been evident in 2006. He wasn't aware that there was a revision that they paid for, acquiesced in, and agreed to. But MMI, so what does the arbitrator do? Okay, she can't do her job. She can't do full duty. Nicholson says she's going to have impairments. Ruder says she's going to have permanent problems with that hand. Ruder, they're examining Dr. Ruh saw her twice. And he just says, sorry, lady, you're done. You get no more money. Oh, and by the way, by the way, Ms. Petitioner, you owe him $186,000. Why? Was it stupidity on their part that they agreed, acquiesced in, and paid for those treatments? You know, we don't have a system now where we can have minute orders. You know, you file a 19B, you go there, and I know you've seen these many times, and you engage in a conversation with your opponent ready to go to trial. And they surrender. But under our system, that surrender, that acquiescence in paying compensation and paying it continually seems to be ignored in this case, doesn't it? Why is that? When you were back in your trial days, and people walked up and said, Judge, we're going to withdraw. We're going to enter an order setting forth the terms of the accommodation. There's an order present. We don't have that benefit. I once asked an arbitrator to do that. I got laughed out of his room. He said, yeah, but we'll have him go to hearing. Yeah, but he doesn't want to go to hearing. And you don't want me to go to hearing because they're surrendering. So how do I codify this? How do I carve this in stone that they're accepting this claim? This decision is an outrage. A, Dole's testimony is certainly competent evidence. There's no abridgment of anybody's rights in that situation. Two, Dr. Nicholson was never made aware, even though we took his deposition long after this string of investigative work by Montella as well as Dole, that there were problems on the right side and the left. You've seen contralateral injuries before. The lady's right arm was restricted. She did everything with her left arm. That's a competent source of diminished capacity. In this case, it required additional medical treatment. And the only reason we tried this case, and I was quite candidly stunned when they didn't send her back to Nicholson after all this additional workup, this case needs to be reversed and remanded. The commission should be advised that they are to consider the evidence of Dr. Dole. And some of the inferences that this arbitrator makes are contrary to law. They're allowed to make reasonable inferences. And I understand the manifest weight issue. But the manifest weight of the evidence means that it's competent evidence on both sides of the scale. There's no evidence to support many of these conclusions and inferences made by the arbitrator. How is it determined that that right shoulder surgery, subsequent to October 2008, is not related? How is that even conceivably possible just using the common sense standard? Please, reverse this decision. Send it back. You all know that there's adequate evidence in here. And I'm not asking you to supersede the conclusions of the trier effect. But I'm asking you to weigh the evidence which is in your province and determine whether that scale is appropriately managed. Thank you. Thank you, counsel. Counsel, you may respond. Thank you. Brad Elward on behalf of S.P. Richards. We're asking you to affirm what is a unanimous commission decision. The commission here adopted a well-written and lengthy arbitration decision, as you probably see every time you have an oral argument call. This is something the commission rarely does. They review the arbitrator's decision. If they agree with it, they don't reinvent the wheel and rewrite a lengthy decision. Now, the arguments that you heard today from counsel are the same arguments. It's the same brief. I would ask you to take a look at the briefs that were written before this Court. Compare them against the circuit court. Compare them against the commission. Mr. Elward, I've got a couple of questions that get to the point. Yes. The commission's finding states that the rotator cuff tear noted and treated by Dr. Dohm in 2009 occurred after October 2008. Now, that simply isn't true. That's not supported by the record. Record shows that the claimant's January 2006 MRI showed a probable small distal partial thickness tear of the rotator cuff. Dr. Nicholson, who reviewed that MRI, agreed that it showed possibility of a partial underservice tear of the rotator cuff and opined that the claimant's condition was work-related. The records in this case indicate that partial thickness tear was identified in 2006 and predated Dr. Nicholson's October 28th evaluation. Do you disagree with that? I think that's what the record says. Well, then the commission's finding is just something wrong. But the commission relied on other aspects. Well, I've got a couple others here. Okay. The record reflects that the commission's finding that Dr. Dohm testified that there was no rotator cuff tear noted in either of the prior operative reports from the claimant's two right shoulder surgeries. That is just wrong. The record reflects that he actually testified that he didn't recall whether the claimant's prior operative reports noted the absence of a rotator cuff. An actual reading in the October 26th operative report shows a partial thickness rotator cuff tear and was noted during surgery and debrided. Neither of the operative reports from the claimant's first two surgeries reflects that a rotator cuff repair was repaired. Thirdly, the record, they say that Montel's records show the claimant reported improvement following her second surgery in March 2008. The record actually shows that Montel consistently documented her ongoing difficulties and her complaints. Now, if they can't get the record straight on what actually happened, why should we affirm their decision? Well, I think there were other things that the commission relied on and the arbitrator relied on in this case. It's not just, you know, this is not just a presentation of saying that there's disagreements. This record obviously has many disagreements in it. Mr. Elwood, it's pretty serious as to the right shoulder. These misstatements of fact are pretty serious as to the right shoulder. I think when this Court looks at this entire record, I think there's ample evidence to support every aspect of what this commission did in this case, whether it's the left or the right or the neck or the left hand. And, yes, this is a case where there's conflicting evidence on some points and there's other aspects where some aspects of the record do conflict with portions of what the commission has found. But I don't think that invalidates the commission's decision. Well, I'm suggesting to you as to these things that I raised, there's nothing that supports their findings. Their findings are just opposite of what the evidence actually is. There's absolutely nothing to support these statements, where they come from. I'm drawing a blank on his report right now, and I apologize. My understanding of this record is that the Dr. Nicholson did agree with a portion and counsel says that he threw up a stone wall. But when you look at Dr. Nicholson, his reports came out sequentially. And over the course of time, he does acknowledge that some of the surgeries are warranted. But he gets to a point where he says this individual is as good as she's going to get, and he criticizes the MMI finding. But I think there's evidence to support the MMI finding at the time the commission decided to draw that line. And so, again, I agree that there's some aspects of the record that are conflicting, but I don't think when we look at it as a whole that it validates or warrants a manifest way. Kennedy, my question is this. If you have an opinion from the commission that may arguably be supported by the record as to one portion of the case, but is so contrary to the record as to another portion of the case, what do you do? Affirm the one portion and reverse the other, or just trash the whole thing and tell them to do it over again? I mean, what's the point? Kennedy, you certainly don't trash an entire opinion. If you disagree with one aspect, you address that aspect. Well, the only reason why I'm saying that is because if they paid so little attention to the one aspect of the case, in this case the right shoulder, and just simply got it wrong, in my opinion, then why should we put any faith in what they did with the left shoulder? Well, when we look at the left shoulder and we look at the grounds that were given, just to try to address a couple of your concerns there. There's no question the left shoulder, there's evidence to support their decision. Exactly. But if you're suggesting that because you disagree, assuming if I acknowledge for the purposes of argument your position with respect to the right shoulder, does that mean we throw out the entire commission's decision? And that's what I'm trying to answer. And I think the answer to that is absolutely not. There's evidence in this record to support the left shoulder findings. There's evidence to support, we think, the right shoulder. We think the TTD. There's definitely evidence to support the neck and the left hand and wrist. And if you disagree with one aspect, certainly there's other aspects that are grounded in the record and they're supported. You know, and I'm going to concede for you there is evidence in the record to support other aspects of this decision. I don't think there's anything that supports the right shoulder analysis. So my question is, why should we give them any deference once we get an opinion like this? Well, I see this Court do this all the time, where the Court will affirm portions of a decision in reverse. And I think we'd be heading down a bad slope if we looked at one issue and said, well, the commission got it wrong. We're going to throw out everything they do on a factual basis. I think that's absolutely the wrong way to look at it. You have to look at these on an issue-by-issue basis. And in this case, it's not just a manifest way issue. It's a manifest way issue as to each point that they're raising, which would be the left shoulder, right shoulder, et cetera. And so I think that's how you have to approach this case. And I think that's fair to everybody. And it's going to be fair to me next time I come before you as an appellee. That's how you look at these cases, issue-by-issue. And I would urge you to do that in this case if you conclude as a whole that we're wrong on this point. But I think the whole decision, if there's support for 90 percent of it, you affirm that 90 percent. And I think that's acceptable practice that this Court's done over the years. Just a couple quick comments. He made a couple remarks with respect to the video and acted like it was essentially an ambush. And all the video was trying to do is demonstrate that this lady's capable of work. And it did so. And you obviously know when the Court receives a video, the Commission receives a video, you can always draw two inferences from it. In most cases, sometimes it's really clear. But here, the arbitrator looked at that video and drew the conclusions. And I would say here's another aspect of this case that the counsels overlooked and we touched upon in our brief. To reach the decision that the Commission did here, they had to find this petitioner not credible. In other words, they had to not believe what she was saying. She testified about the nature of her injuries when they arose. And some of the medical contradicted that. They went with the medical that contradicted that. She testified, I didn't work at that shoe store. I was just there talking to people. The video showed otherwise. The arbitrator went with the video and found that to be persuasive and rejected the comments. So when we look at all the issues, even the right shoulder issues and whether they're overrelated or not, you have to also factor in the credibility aspect in this case and acknowledge that this arbitrator and this Commission. Remember, the arbitrator watched this testimony come down. This isn't a case where the arbitrator made findings and was reversed by the Commission. Arbitrator drew conclusions on credibility and the Commission affirmed all those findings. So we've got a finding here. It's not expressed, but we have an implicit finding based on the wording of this case that this lady's not credible. Arbitrator didn't believe her. And I think that speaks volumes of this case. Thank you. Thank you, counsel. Counsel, you may reply. If it pleases the Court, I just have a couple of quick comments. First of all, let's talk about the video. Well, counsel, let me tell you this prior to addressing the video. You understand it's not in the record? The surveillance video is not in the record. No, I'm not aware of that because we went through great pains to make sure there was a plastic envelope to contain it. Right. So go ahead. Well, first of all, let's keep something in mind here. Ms. Magadan, up until her employer, imposed the economic death penalty. She was working despite the admonition of three separate doctors that she could not work at full duty, that she had to have restrictions. In the November note of Dr. Patari, you can see the stridency with which he's imposing these restrictions, how mandated they are, ignored. So on December 5th, they cut her off. We can't use you anymore. We don't know why. But she's gone. She had MMI? No. Is she under active medical treatment? Yes. She's entitled to benefits. Yet the arbitrator concluded from his viewing of the video that the only conclusion was that she was capable of employment. E.R. Moore and the other cases that talk about casual employment go through long analyses of whether or not that activity eliminates their entitlement to temporary total disability. We covered that in our brief. I just wanted to cover that. And again, Your Honor, I have no understanding why that video didn't make it from the circuit court to here, because it was the left shoulder. The left shoulder, in isolation, can be argued to be not related. I'd have a tough time making that argument, but I suppose with enough motivation I could make that argument. The argument made by my opponent and the argument adopted by the arbitrator was that in 2004 she reports an on-the-job injury because of heavy lifting where she has a problem with left shoulder pain. There's two visits, an MRI, a short period of therapy, and she's sent back to work. So from 2004 to 2005, she's working full duty, 127 orders filled per hour, per hour. Think about the cycles of that in a seven-and-a-half-hour day. When we talk about this left shoulder, eliminate it for a minute, the question then becomes this. On October 28th, if you adopt the conclusion of Greg Nicholson that she was an MMI, was she able to go back to her former job? No. Dr. Reuter said she's going to have permanent restrictions way back when on that left hand. Nicholson says she's got continuing problems and says get an FCE, and that should be able to demonstrate what she's capable of doing. So at a very minimum, if there was some way we could be prescient and determine that the commission's going to cut her off as of the date of Nicholson's exam, VOC rehab assessment would be done, and this lady would be sent out into the hinterlands to find an accommodated job. The liability for lost term benefits, however, doesn't end as long as she's diligently pursuing that requirement of finding an But again, remember, the right shoulder, she had more surgery. So how was the arbitrator picked? Arbitrarily, no pun intended, October 28th, she's no longer entitled. Oh, and by the way, that earlier period of TTD when they laid her off and she was under these significant restrictions, the fact that she Thank you, gentlemen. I appreciate your attention to this matter. Thank you, counsel. This matter will be taken in advisement. If there's any additional issues, of course, we can at recess.